GEOFFREY HANSEN
Acting Federal Public Defender
SOPHIA WHITING
Assistant Federal Public Defender
450 Golden Gate Avenue
San Francisco, California  94102
Telephone:   (415) 436-7700
Facsimile:    (415) 436-7706
Email:        Sophia_Whiting@fd.org

Counsel for Defendant RAMIREZ

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, | **Case No.:** CR 21-00160 RS |
| Plaintiff, | **SENTENCING MEMORANDUM** |
| v. | |
| JESUS ASCENCIO RAMIREZ, | |
| Defendant. | |

**INTRODUCTION**

Jesus Ascencio Ramirez promptly waived indictment and pled guilty to aiding and abetting an attempt to possess with intent to distribute 500 grams or more of cocaine. Dkt 34, 35. He accepts full responsibility for the terrible and uncharacteristic actions he took in this case. He is guilty of this crime by aiding and abetting his co-defendant Francisco Reus in attempting to buy cocaine from an undercover government agent after a confidential source reached out to Mr. Ramirez in search of a buyer. In the interest of justice and in light of Mr. Ramirez's specific mitigating circumstances, he requests the same sentence as Mr. Reus—time served and 18 months of home confinement as a condition of five years of supervised release.

Mr. Ramirez is 46 years old and has **zero criminal history**. He has lived in the United States for nearly three decades, after coming here when he was around 20 years old to provide medical care and a stable future for his daughter, Anahi. He raised three incredible children, at times being their primary caretaker after their mother left the relationship, and is still raising his 12-year-old son.

At the time of the offense and presently, Mr. Ramirez has a medical disability—he requires future surgery and ongoing treatment for his debilitating chronic back conditions, which also affect his left hip and leg.[1] In light of the mitigating factors, Mr. Ramirez respectfully requests that the Court vary downward under the factors of 18 U.S.C. § 3553(a) and impose upon him a custodial sentence of time served (three days) followed by five years of supervised release, with a special condition of 18 months of home incarceration. Home incarceration will allow Mr. Ramirez to receive the medical care he requires, continue caretaking for his 12-year-old son, and punishes Mr. Ramirez for this grave mistake in his otherwise hard-working and law-abiding life.

---

[1] Specifically, Mr. Ramirez has been diagnosed with lumbar radiculopathy, lumbar disc herniation, and chronic low back pain. Declaration of Sophia Whiting (Whiting Decl.), Ex. K at 1-2. He had spinal surgery, a decompressive lumbar laminectomy, in November 2019. *Id.* He has since received multiple steroid injections (facet joint injections) and a radiofrequency ablation to attempt to manage the condition, but has been advised that additional surgery may be the only remaining alternative. *See id.*

**BACKGROUND**

Jesus Ascencio Ramirez was born into an abusive and emotionally unstable family in Guadalajara, Mexico. *See* Presentence Investigation Report (PSR) ¶ 51, 53. Starting around age five, Mr. Ramirez's father would beat him with belts and horse whips, leaving welts. PSR ¶ 53. His father justified the abuse as in response to Mr. Ramirez's work on the ranch, where he started working while only a preschool aged child. PSR ¶ 52. While his parents were initially financially stable, when Mr. Ramirez was around ten years old a group of corrupt law enforcement officers burglarized the ranch, robbed them of their property, and threatened to kill the family. PSR ¶ 54. His family escaped to Nayarit, Mexico, but there his father became more violent and unpredictable. *See id*. His father began an affair and he saw his father threaten his mother with a gun, leaving Mr. Ramirez feeling scared and powerless. *Id*.

Mr. Ramirez and his mother returned to Guadalajara, although they were destitute and forced to live in squalor. *See* PSR ¶ 55. Mr. Ramirez worked hard as a teenager, but his father came back into the picture and would take his earnings. *Id*. At 16 years old, Mr. Ramirez fell in love with the future mother of his children, Claudia. PSR ¶ 60. His father disapproved of the relationship. They had their daughter Anahi when Mr. Ramirez was 19 years old. *Id*. Still struggling financially, lacking family support, and now facing Anahi's ongoing ear infection, the family ultimately decided to move to the United States in search of medical care and family contacts who had settled in Los Angeles and the Bay Area. *See* PSR ¶ 58.

From there, Mr. Ramirez was largely successful in pursuing the American dream, despite having only a second grade education. *See* PSR ¶ 76. His abusive and traumatic upbringing made him determined to build a stable and positive life for his family. By all accounts, that is exactly what he did for nearly three decades. *See* PSR ¶ 61, 78-82; *See also* Whiting Decl., Exs. A-J (letters of support). Mr. Ramirez worked incredibly hard, oftentimes six days per week, at any job he could find. He worked his way up from washing cars to working on auto body repairs. PSR ¶ 78-82; Whiting Decl. Ex. B. Despite not having much time off, he took every spare minute to be present and involved in his three children's lives.

1       This admirable life, though, was not without significant struggles. In 2011, Mr. Ramirez

2  suffered an injury at work that has plagued him for over a decade. PSR ¶ 67. He was removing

3  the roof of a double-decker tour bus when the roof began to shift and caused the tall ladder he

4  was using to fall over. *See id*. He crashed to the ground, injuring his foot and hip. *See id*. He

5  went to the hospital that night and thought he treated it sufficiently at the time. *See id*. He

6  returned to work immediately. *See id*. But in 2018, the pain to his back, hip, and down his left

7  leg became unbearable. PSR ¶ 67-68. He could barely walk, used crutches for short distances,

8  and was unable to work. In November 2019, Mr. Ramirez underwent spine surgery to try to

9  treat the issue. PSR ¶ 68; Whiting Decl. Ex. K. While the surgery helped, it did not provide a

10 permanent solution for the pain and mobility issues. *See id*. Over the past two years he has

11 received multiple steroid injections and a nerve ablation, which provide only short-term relief.

12 *See id*. Another surgery is the next step.

13      In additional to physical ailments, Mr. Ramirez has also struggled with his mental

14 health. PSR ¶ 71-73. In 2016, Mr. Ramirez learned his wife was having an affair with his son's

15 boxing coach. PSR ¶ 71; *see also* Whiting Decl. Ex. K. This devastated Mr. Ramirez and

16 caused him to have a mental and physical breakdown. *See id*. He reported to San Francisco

17 General Hospital for chest pains and weight loss. *See id*. He received mental health counseling,

18 which he found helpful, and eventually was able to control the depressive episode. *See id*.

19 Despite the mental battle Mr. Ramirez was suffering, he knew the most important thing was to

20 stay strong and present for his children. He did just that. When his ex-wife moved out, Mr.

21 Ramirez became the primary caretaker to his children while still working full time. Whiting

22 Decl., Ex. B. Since then, Mr. Ramirez and his wife have been able to negotiate a joint custody

23 arrangement.

24      The mental and emotional toll of being a single father while struggling with debilitating

25 health issues caught up with Mr. Ramirez. He could barely walk at times, nonetheless contort

26 his body for hours each day as required for his job in auto repairs. Then came the COVID-19

27 pandemic, making his financial circumstances even more difficult. He qualified for disability

28 benefits, but would often not receive his checks or they would be delayed by months. Trying to

1   contact the Employment Development Department during the height of a global pandemic got

2   him nowhere.

3       It was around this time that a friend of Mr. Ramirez mentioned he knew people

4   involved in the drug trade and this could be a way for Mr. Ramirez to make some money,

5   which Mr. Ramirez explained to the government as part of his safety valve proffer. Mr.

6   Ramirez started texting with this friend's drug contacts, which lead to the government's

7   confidential source (CS) calling Mr. Ramirez with an offer to sell a kilogram of cocaine for the

8   below-market price of $33,000. Mr. Ramirez explained to the CS that he would not buy the

9   drugs himself, but that he may know someone who would. He was thinking of Francisco Reus,

10  a man he knew since 2011 when they met at an auto shop run by their mutual friend Mario. He

11  heard over the years that Mr. Reus was involved in this sort of business. And when he brought

12  up the topic to their mutual friend Mario, Mario said Reus would be interested.

13      Mr. Ramirez reached out to Mr. Reus with the offer, which according to Mr. Reus was a

14  great deal. Mr. Reus provided all of the money involved in this offense and was planning to

15  buy the cocaine himself for distribution. PSR ¶ 21, 25-26. They never came to a specific

16  agreement about what Mr. Ramirez would get out of connecting Mr. Reus and the CS—a fact

17  uncontroverted by either the CS or Mr. Reus—but Mr. Ramirez's understanding was that he

18  would receive financial compensation from Mr. Reus once the deal went through. These were

19  two down-on-their luck acquaintances who took advantage of an opportunity, thereby making a

20  terrible, inexcusable, and life changing error.

21      Since his arrest, Mr. Ramirez has complied perfectly with every condition of pretrial

22  release. He is working two jobs, despite his ongoing pain and medical needs. He still spends

23  every free moment with his children and grandchild (soon to be grandchildren). As for Mr.

24  Ramirez's safety valve proffer, defense counsel first asked government counsel if they would

25  accept a letter to satisfy safety valve, due to the language barrier, Mr. Ramirez's nervousness

26  about the ramifications of cooperation, and the fact that the proffer is not required to be oral.

27  The government instead requested an oral proffer. During the oral proffer, defense counsel

28  raised concerns regarding the agents' approach to questioning and Mr. Ramirez was very

nervous. The government was not satisfied with this initial proffer, so Mr. Ramirez followed up with a written proffer further explaining his involvement, including providing details about the conduct of himself and others in the months leadings up to the offense and explaining that he expected to be financially compensated for his role by Reus. The government has indicated that they have some reservations, so Mr. Ramirez has offered to answer any remaining questions or confusion. Mr. Ramirez thoroughly explained his role before and during the offense, and his statements are corroborated by the evidence. The government and U.S. Probation agree that he has satisfied the requirements of safety valve through his proffers.

The impact of incarceration on Mr. Ramirez's life is clear. First, Mr. Ramirez's health will suffer tremendously from incarceration. Mr. Ramirez has been dealing with hip and back pain for more than a decade, and it has gotten significantly worse over the past two years. The only remaining alternative is another surgery. There are no promises about the success of the surgery, the recovery time, nor whether more than one surgery may be required. This tenuous health situation is simply too much to ask or expect Bureau of Prisons to respond to adequately, nonetheless effectively.

Second, Mr. Ramirez still has a minor son who he provides for financially and emotionally. For years after Mr. Ramirez's wife left him, Mr. Ramirez was his sons' primary caretaker. They lived together in a house where the children were raised. Around the time of the offense, their housing was in jeopardy because they were behind on rent and the owners wanted to sell the home. After Mr. Ramirez's arrest, the house was ultimately sold and they could no longer live there. Their youngest son now splits his time between Mr. Ramirez's apartment and his ex-wife's apartment, just a couple blocks apart in San Bruno. Mr. Ramirez drives him to school every morning, they spend every weekend together, and Mr. Ramirez provides financial support including food, housing, and other basic needs.

Mr. Ramirez's past shows he has spent the vast majority of his life being a good and law-abiding man. His life has already been changed by his terrible decisions in this offense. There is no danger that Mr. Ramirez will ever be involved with this kind of conduct again.

**DISCUSSION**

## I. The Sentencing Guidelines (18 U.S.C. § 3553(a)(4))

Mr. Ramirez agrees with the government and U.S. Probation that the Adjusted Offense Level is 19, as set forth in the parties' plea agreement. He also agrees with U.S. Probation's calculation of his Criminal History Category, I, for a sentencing range of 30 to 37 months.

Although the court must remain mindful of the Guideline recommendation, the range established by the Sentencing Guidelines is not presumptively reasonable and it cannot be given any more or less weight than any other factor listed in section 3553(a). *United States v. Autery*, 555 F.3d 864, 872 (9th Cir. 2009); *United States v. Carty*, 520 F.3d 984, 991 (9th Cir. 2008). The court's paramount concern must be to "'impose a sentence sufficient, but not greater than necessary' to reflect the seriousness of the offense, promote respect for the law, and provide just punishment; to afford adequate deterrence; to protect the public; and to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment." *Carty*, 520 F.3d at 991.

Under the applicable 18 U.S.C. § 3553(a) factors discussed below, Mr. Ramirez respectfully requests that the Court vary downward from the low end of the advisory range to a sentence of time served (three days) and five years of supervised release, with a condition of eighteen months of home detention.

## II. Mr. Ramirez's History and Characteristics Warrant a Downward Variance (18 U.S.C. § 3553(a)(1))

Mr. Ramirez is the first client undersigned counsel has ever had that does not have a single notation listed under his criminal history. PSR ¶ 43-49. Not only has Mr. Ramirez gone nearly five decades of his life without a single conviction, he has never even been arrested or seemingly had any contact with law enforcement. This is consistent with his personal and employment history in the PSR and the overwhelming letters of support submitted by his family, friends, and employer. This includes a letter from Mr. Ramirez's longtime friend, retired San Francisco Deputy Sheriff René González, expressing his shock yet continued support in light of Mr. Ramirez's lifetime of admirable conduct. Whiting Decl., Ex. G.

Mr. Ramirez led this admirable life despite incredible hardships. Mr. Ramirez's upbringing included physical and emotional abuse by his father, a traumatic home invasion by corrupt local police, and extreme poverty as a teenager in Mexico. To escape this background and provide needed medical care for his daughter, he made the arduous journey to this country as a very young man with his wife and infant daughter.

For decades, Mr. Ramirez was able to persevere through law-abiding hard work, but in the fall of 2020, he made terrible decisions. His back was deteriorating, he could not maintain the same level of employment, disability payments were sporadic and behind, rent was overdue, and the landlords were threatened to sell the house he and his family had lived in for years. He should have asked his children for more help, tried harder to figure out the disability payments, and reached out to social services. Instead, he made the terrible decision to get involved with drugs. He has not gone a day without feeling the weight of this mistake and will never let this happen again.

### III. The Nature and Circumstances of the Offense Warrant a Sentence of Time Served (18 U.S.C. § 3553(a)(1))

As described above, while it is no excuse, this offense presented itself as an opportunity when Mr. Ramirez was going through a terrible time and looking to make a quick buck. The government acknowledges that "it has no evidence of aggravating conduct, violence or threatened violence, or evidence of connections to organized crime." Dkt. at 3. Mr. Ramirez did not have the money to buy a kilogram worth of cocaine nor the knowledge to distribute it, but he was willing to get involved with a large-quantity transaction by connecting the government's undercover agent to Mr. Reus for the sale. Mr. Ramirez is not requesting a sentence lower than Mr. Reus because he accepts full responsibility for his role coordinating the reverse buy and he did expect to be financially compensated by Mr. Reus. The facts are clear, though, that the money was Mr. Reus's, Mr. Reus clearly stated he—not Mr. Ramirez—was the buyer, and that he wanted to sample the product himself rather than rely on Mr. Ramirez. PSR ¶ 25. Mr. Ramirez also took cues from Mr. Reus, who has experience with drug dealing, including moving the location of the deal. PSR ¶ 22. Mr. Ramirez accepts full

responsibility for his role and has truthfully and completely explained to the government the circumstances surrounding the offense—these were two troubled acquaintances taking advantage of an illicit opportunity.

## IV.   Mr. Ramirez's Family Ties and Responsibilities Warrant a Sentence of Time Served (18 U.S.C. § 3553(a)(1))

Sentencing factor 3553(a)(1) permits the Court to consider Mr. Ramirez's family ties and responsibilities. Mr. Ramirez's greatest concern is what will happen to his 12-year-old son if he is incarcerated. For years following Mr. Ramirez's separation from his ex-wife Claudia Garcia, he was the primary caretaker for his children. While fortunately Mr. Ramirez and his ex-wife have been able to arrange a joint custody arrangement, she also works two jobs and has always relied on Mr. Ramirez to care for their child on a daily basis. Whiting Decl., Exs. B, D, E. Despite their strained relationship, Ms. Garcia has nothing but kind words to say about Mr. Ramirez and his vital role as a father to her children. *See id* ("After our separation 6 years ago his health got worse. But even with that, he never stopped supporting me in everything having to do with his children…I know that this bad decision he made was the worst of his life but I also know that he is sorry and I also know that if God were to give him another chance he would not waste it.").

## V.   Just Punishment, Respect for the Law, and Deterrence is Accomplished with a Downward Variance (18 U.S.C. § 3553(a)(2)(A), (B))

Mr. Ramirez takes responsibility for his criminal conduct and knows better than anyone that he should not have become involved in the dangerous and harmful crime of trafficking in cocaine. He has, and will, pay for his criminal conduct for the rest of his life. He went from being a highly regarded working man and father without a single blemish on his record to being convicted of a federal felony. While fortunately his friends and family still support him, he will never live down the disappointment and risk he brought into his life and the lives of his children. He will also suffer the lifetime of collateral consequences.

Specific deterrence is not an issue in this case—Mr. Ramirez deeply regrets his involvement in this offense and his history of law-abiding conduct before the offense and while on pretrial release demonstrates that he will never repeat this mistake. As noted by U.S.

Probation, "since Mr. Ramirez has never served any time in custody, any sentence he would receive in this case would serve as general deterrence." PSR, Sentencing Recommendation at 3. It is incredibly rare for a defendant in federal court to have no criminal past, and simply the decision of the federal government to pursue charges and receive a federal felony conviction against someone in Mr. Ramirez's position serves as a deterrent to anyone contemplating involvement in cocaine trafficking.

Eighteen months of home incarceration is just punishment. While certainly favorable to prison, one and a half years of confinement is still a significant restriction on Mr. Ramirez's liberty while addressing the practical reality of his medical needs and the needs of his son. Furthermore, it would not be just to sentence Mr. Ramirez to a harsher sentence than Mr. Reus, when Mr. Ramirez has no criminal history, a stellar employment history, pressing medical needs, and caretaking responsibilities to his minor child. U.S. Probation recognizes that Mr. Reus and Mr. Ramirez's mitigating factors call for the same sentence.

### VI.    The COVID-19 Pandemic Warrants a Sentence of Time Served or an Alternative to Incarceration, Given the Kinds of Sentences Available and Public Policy (18 U.S.C. § 3553(a)(2)(A))

Time served and home incarceration is additionally warranted in this case because the further incarceration of Mr. Ramirez is an unnecessary risk to his health and safety, and the safety of the community. The Court is well aware of the dangers of incarceration during the pandemic. These conditions are all still true, despite the efforts at controlling outbreaks and despite the availability of the vaccine. The COVID-19 pandemic has repeatedly proven to be unpredictable and is still causing outbreaks at Santa Rita Jail and federal prisons, despite admirable strides in the right direction. Managing outbreaks also means that inmates are living under harsher conditions than ever before, with drastically increased cell confinement and cuts to programming and rehabilitation.

Mr. Ramirez should not be re-incarcerated in this dangerous time, especially not with his health conditions and the alternative sentences available.

**CONCLUSION**

For the aforementioned reasons, the Court should sentence Mr. Ramirez to a term of time served and eighteen months of home confinement.

Respectfully submitted,

Dated:   October 26, 2020

GEOFFREY HANSEN
Acting Federal Public Defender
Northern District of California

/S

SOPHIA WHITING
Assistant Federal Public Defender